IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-2945 |
| | § | |
| EVOLUTION CAPITAL ADVISORS, LLC, *et al.,* | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

Before the court is plaintiff the Securities and Exchange Commission's ("SEC") motions for preliminary and permanent injunction, asset freeze, and appointment of a receiver. Dkts. 4, 6. After consideration of the motion, the response, the reply, the evidence presented at the hearing on this matter, and the applicable law, the motions are GRANTED.

### BACKGROUND

This action was filed by the SEC on August 10, 2011. Dkt. 1. The SEC alleges securities fraud with respect to two "Secured Note" offerings by defendants Evolution Capital Advisors, LLC ("ECA"), Evolution Investment Group I, LLC ("EIGI"), and Damian Omar Valdez ("Valdez") made between February 2008 and August 2010. *Id.* Defendants are alleged to have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). The Securities Act applies to the "offer or sale" of securities, and the Exchange Act applies more broadly "in connection with the purchase or sale" of securities.

The two Note offerings at issue in this case involve investment opportunities arising from a loan program administered by the Small Business Administration ("SBA").  There is a crucial distinction in this case between two types of investments that can be made in SBA loan products. One investment opportunity is to actually purchase an SBA loan or pool of loans, and the other is to purchase something called a Small Business Administration Interest Only Strip ("SBA IO Strip"). The parties' evidence concerning the nature of the SBA Loan Program and of SBA IO Strips, and the government guarantees associated with each, is entirely consistent.  What is disputed in this case is the adequacy of information provided to potential investors by defendants, and more specifically whether defendants misled investors to believe that defendants would invest in more secure SBA loans, when defendants intended to invest in more risky SBA IO Strips.  Thus, resolution of this case requires an understanding of the different risks inherent in the two types of investments, and will also require a detailed review of the offering memoranda used by defendants to obtain investors.

**1.      SBA guaranteed loans.**

The SBA guarantees loans made to small businesses up to 75% of the principal amount of the loan.  A bank making an SBA-backed loan can "sell" the 75% of the loan that is guaranteed on the secondary market , while retaining the 25% of that loan that is not guaranteed.  The guaranteed portion of the SBA loan is sold to investors for a premium, and the issuing bank quickly recoups 75% of the money it loaned, and a premium payment from the investor.  The investor, in turn, possesses the entire guaranteed portion of the principal of the loan and the right to payments of both principal and interest.  The only risk the investor has in this scenario if the loan prepays or goes into default is with respect to the amount of money paid to the bank as premium.  For example, an SBA loan with a guaranteed principal sum of $100,000 might be sold to an investor for $107,000 with

the additional $7,000 representing "premium."  The investor who purchased this loan would be entitled to the payments made thereon.  If the underlying loan defaults or prepays, the principal sum remaining at the time of default or prepayment is *not* at risk because the principal purchased by the investor is guaranteed by the SBA.  Thus, when considering an investment in a guaranteed SBA loan, an investor's risk is limited to the unearned "premium" that was paid at the time the loan was purchased, or $7,000 of the $107,000 in the illustration above.

**2. SBA IO Strips.**

An SBA IO Strip, however, has no "principal" element and consists entirely of  "premium" paid by an investor.  SBA IO Strips are created because some SBA loans have higher interest rates than others.  When those loans are "pooled" for sale in the secondary market, some portion of the interest rate from a higher-interest loan will be "stripped" so that the pool of loans created have identical interest rates.  For example, a bank holding a 6%  SBA loan may "strip" 1% of that interest off of the loan so that it can be pooled with a group of 5% SBA loans.  The bank can then sell on the secondary market not just the pooled SBA loans, but may also sell the portion or portions of any such loans that have been "stripped" to create the pool—this is an SBA IO Strip.  As payments are made on the underlying loan, the holder of the SBA IO Strip is forwarded that portion of the interest payment to which he or she is entitled.  These payments of interest are "guaranteed" by the United States in that any interest *actually* paid on the underlying loan will be forwarded to the holder of the SBA IO Strip.  A further guarantee applies in the event of a prepayment or default on the underlying loan.  At the point of default, interest payments will be guaranteed by the SBA only for another few months, usually about 6 months. If a loan prepays, interest payments are guaranteed for only 60 to

3

90 days.  After prepayment or default, and the expiration of the limited guarantee period, an SBA IO Strip becomes worthless and no further guarantee applies.

Using the same example employed for the SBA loan above, an investor with $107,000 to invest may purchase an SBA IO Strip, but there is no "principal" aspect of that investment.  Rather, the entire cost of the investment is at risk if the holder of the underlying SBA loan prepays or defaults.  The holder of the Strip would be entitled to approximately 90 additional days of interest payments (or about 6 months of such payments in even of default), but no more, and any of the original $107,000 investment that has not yet been recovered through interest payments is lost.  This risk of loss due to prepayment or default is substantial because the loans underlying the Strips typically have 20 to 25 year terms, and SBA IO Strips, at the time the Notes in this case were created, tended to prepay or default at a rate of approximately 15% per year.

In short, the risks associated with investments in SBA loans and those associated with investments in SBA IO Strips differ dramatically.  An investor who purchases SBA loans has a very limited risk due to the nature of the guarantee offered by the SBA which covers the bulk of the investment.  An investor in SBA IO Strips bears a much more substantial risk of loss because he or she has only purchased the right to future payments of interest due on a 20 or 25 year loan.  Upon prepayment or default, the SBA guarantees only an additional few months of interest payments.

**3.     The SEC's allegations.**

The SEC alleges that defendants, through misleading and incomplete representations to potential investors, committed securities fraud.  First, ECA issued a Note offering through a "private placement memoranda" (the "C1/D1 PPM") seeking investors whose funds would be used to invest in a portfolio of debt obligations "guaranteed by the full faith and credit of the United States

Government" through the Small Business Adminstration ("SBA"), and promising 9% returns for a three year investment ("C1") or a 10% return for a five year investment ("D1"). *Id.* ¶ 2. This offering resulted in investments from 49 investors totaling $4.7 million. *Id.* ¶ 20. Next, EIGI, a new entity created and wholly owned by ECA, made a Note offering of its own, again through a private placement memoranda (the "C2/D2 PPM"), promising 7% returns for a three year investment and 7.5% returns for a five year investment. *Id.* ¶ 2. EIGI raised approximately $5.4 million from 33 investors. Of this amount, $2.7 million were used to pay off ECA's debt to "C1/D1" investors in what the SEC characterizes as "Ponzi" payments. *Id.* ¶¶ 8, 34.

Together, defendants are alleged to have raised a total of $10.1 million from "more than 80 investors" on representations, *inter alia*, that the Notes were backed by a "safe, secure portfolio of loan assets guaranteed by the United States Government" when, in fact, all of the assets backing the C1/D1 Note, and the bulk of the assets backing the C2/D2 Note, were actually investments in "SBA IO Strips" which are not guaranteed against prepayment or default. *Id.* ¶ 3. Further, defendants are also alleged to have promised in both PPMs to use "substantial leverage" with respect to the investments through obtaining financing on favorable terms in order to maximize returns on the investment portfolio, but no such financing was ever obtained. *Id.* ¶ 6.

The alleged misrepresentations in the two offerings, along with defendants' practice of taking "exorbitant" fees in the amount of $2.4 million over two years, have, in the SEC's view, created a "dire" financial situation for defendants and, in turn, the investors who responded to the PPMs. Dkt. 1 ¶¶ 7-8. Since the initial offering, almost one quarter of the SBA IO Strips purchased by defendants have either prepaid or defaulted resulting in "substantial" losses of investors' funds. *Id.* ¶ 8. Thus, as of December 31, 2010, the assets of EIGI (which now holds all of the outstanding

Notes after buying out the C1/D1 investors' interests) were at least $1.4 million less than the amount owed to its current investors.  *Id.*

The SEC filed a motion seeking an order freezing assets and appointing a receiver (Dkt. 3), and  a motion for a preliminary injunction (Dkt. 6).  On August 26, 2011, the parties agreed to an order freezing defendants' assets and imposing other restrictions on defendants' operations pending a further ruling by the court.  Dkt. 12.  Defendants filed a response to the motions for preliminary relief.  Dkt. 16.  The SEC filed a reply.  Dkt. 18.  A hearing was held on October 19-20, 2011.  The motions seeking preliminary relief are, therefore, ripe for disposition.

## Legal Standards

As noted above, defendants are alleged to have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").  15 U.S.C. § 77q(a); 15 U.S.C. §78j(b).  The Securities Act applies to the "offer or sale" of securities and the Exchange Act applies more broadly "in connection with the purchase or sale" of securities.  The parties agree that the Notes in this case satisfy the definition of "security" under either statute.  There is also no dispute concerning the governing legal standards.

### 1.    Securities Fraud

To prove violations of the antifraud provisions of the Exchange Act, the SEC must show Defendants:  (a) by the use of the mails or an instrumentality of interstate commerce; (b) made false and misleading statements or omissions of material fact or otherwise employed any device, scheme or artifice to defraud or engaged in any transaction, practice or course of business which operates as a fraud or deceit; (c) in connection with the offer, purchase, or sale of securities; and (d) acted with the required intent or *scienter.  Aaron v. SEC*, 446 U.S. 680, 697 (1980); see 15 U.S.C. §

78j(b); 17 C.F.R. § 240.10b-5.4.  The same elements apply under Sections 17(a)(2) and 17(a)(3) of the Securities Act, except that no *scienter* is required.  15 U.S.C. § 77q(a).

A misrepresentation or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978 (1988).  For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id*., 485 U.S. at 232. Materiality is judged in light of the surrounding circumstances.  *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).  The appropriate inquiry is whether, under all the circumstances, the statement or omitted fact is one that a reasonable investor would consider significant in making the decision to invest, "such that it alters the total mix of information available about the proposed investment."  *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993).

Scienter is the "mental state embracing intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375 (1976).  Scienter may be established by showing intentional or severely reckless conduct.  *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care."  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoted case omitted); *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) (severe recklessness involves a present danger of misleading buyers or sellers of securities that is either known to the defendant or is so obvious that the defendant must have been aware of it.).

7

### 2.    Injunctive Relief

The SEC has a statutory grant of authority with respect to injunctive relief under both the Securities Act and the Exchange Act, and so traditional tests do not apply.  15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d).  Indeed, "Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and § 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), authorize the Commission to seek and direct the courts to enter permanent restraining orders upon a 'proper showing' that the defendant 'is engaged or is about to engage' in violations of the securities laws." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981).  The parties agreed at the hearing held in this matter that the court could proceed to a ruling on permanent injunctive relief in this case on the record established at the hearing.

Proof of a past violation of the securities laws alone is insufficient to support permanent injunctive relief.  *Id.*  Instead, the court must determine whether the defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a "'reasonable likelihood' of future transgressions." *Id.*  In imposing a permanent injunction, courts consider a number of factors, including the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of opportunities for future violations.  *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2009) (citing *SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)).  The "critical question in issuing the injunction and also the ultimate test on review is whether defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Blatt*, 583 F.2d at 1334.  The proper standard of proof in a hearing on injunctive relief under the antifraud provisions of the

securities laws is the preponderance of the evidence.  *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 434 (5th Cir. 1981).

District courts also possess broad equitable power in securities fraud cases to fashion appropriate ancillary remedies necessary in order to grant full relief.  *SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994).  The appointment of a receiver is a "well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief."  *First Fin. Grp. of Tex.*, 645 F.2d at 438 (citations omitted).

> The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has allegedly defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought.

*Id*.  In fact, upon a showing of fraud and mismanagement, appointment of a receiver "becomes a necessary implementation of injunctive relief."  *Id*.

The court is also empowered to freeze defendants' assets to preserve the *status quo*, and to prevent dissipation of monies obtained by fraud, and protect investors.  *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978);  *SEC v. Brooks*, 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999) (Fitzwater, J.) (citing *SEC v. Schiffer*, 1998 WL 307375, at *7 (S.D. N.Y. June 11, 1998)).

### EVIDENTIARY RECORD

**1.      ECA, EIGI and Valdez.**

ECA is a Delaware limited liability company established in 2006, and is controlled by Damian Omar Valdez ("Valdez"), its founder, owner, and managing member.  SEC Ex. 29 at 84-85. EIGI is also a Delaware limited liability company established by Valdez in May, 2008.  ECA is the

managing member of EIGI, and holds a 99% interest in EIGI.  *Id.* at 86.  Valdez controls ECA and,

through ECA, EIGI.[1]  EIGI, upon its creation, assumed all of ECA's debts and obligations relating

to the C1/D1 notes issued by ECA.

**2.       The C1/D1 PPM issued by ECA.**

ECA issued a Note offering dated January 2, 2007.  Investments were made between

February 2008 and August 2008 in a total amount of $4.7 million by 49 investors.  Dkt. 5-1 ¶ 12.

The executive summary of the C1/D1 PPM begins as follows:

> "The primary objectives of this program are:
>
> 1.       Preservation of capital;
> 2.       Quarterly payments of interest for each class of note . . .
> 3.       Full repayment . . . [at the] maturity dates.

SEC Ex. 5 at APP00133.  The "INVESTMENT ANALYSIS" portion of the PPM appears

immediately following the statement of objectives, and states the company's belief that its "United

States Government Guaranteed Loan Program" has "major advantages for investors" including:

> 1.       Safety of principal because the Notes are secured by a portfolio of
> debt obligations guaranteed by the full faith and credit of the United States
> Government, its agencies or instrumentalities, assignments of interest in such
> obligations, and commitments to purchase such obligations ("Guaranteed Debt
> Obligations").

---

[1]       Defendants do not contest the SEC's argument that Valdez controls ECA and EIGI, and is responsible for all actions taken by both entities.  Further, it is uncontested that both PPMs were issued after Valdez approved them and/or assisted in drafting them.  Thus, for purposes of establishing a violation of the securities fraud provisions, Valdez's state of mind is imputed to ECA and EIGI.  See *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  The court will not, therefore, differentiate between actions taken by the Valdez and actions taken by the entities he controlled during the course of this opinion.  For the same reasons, if ECA's and EIGI's actions are found to have violated the antifraud provisions, Valdez would necessarily be liable for aiding and abetting pursuant to Section 20(e) of the Exchange Act, and as a controlling person under Section 20(a) of the Exchange Act.  15 U.S.C. § 78t(a) and (e).

SEC Ex. 5 at APP000135.

The "BUSINESS" section of the executive summary also begins with specific mention of the guaranteed nature of the investments:

> In pursuing the objective of earning the highest level of income consistent with safety, liquidity, and preservation of capital, [ECA] has been formed to invest solely in debt obligations guaranteed by Agencies of the United States and backed by the full faith and credit of the United States government. **These debt obligations will consist of the guaranteed portion of floating-rate loans guaranteed by the United States Small Business Administration ("SBA")** under the SBA 7(a) program, and the U. S. Department of Agriculture ("USDA"), and **may also consist of other portions of loans that are guaranteed by the United States Government under various government guaranteed loan programs** . . . .

*Id*. (emphasis added).  Investors are then given a description of the "secondary market" in SBA loans indicating that "lenders are able to sell the guaranteed portion of SBA guaranteed loans to investors and thereby improve their liquidity and increase their yield on the un-guaranteed portion of SBA loans."  *Id*. at APP00135.

The PPM goes on to indicate that ECA "will utilize the proceeds from this offering and a credit facility or facilities to be obtained from a bank or other financial institution . . . to finance the purchase of SBA, USDA, and other U.S. Government Guaranteed Loans." *Id*.  Investors were then informed that ECA management "estimates that 10% to 20% of the Loan portfolio purchase price will be derived from the sale of Notes and 80% to 90% from the proceeds of the Credit Facility." *Id*.  In other words, investors were informed that most of the "guaranteed loans" purchased by ECA would be purchased not from investor funds, but from bank loans ("credit facilities").  This "leverage . . . is expected to enable [ECA] to pay debt service on the Notes and earn management fees and a profit on its Loan purchase and trading business." *Id*. at APP00136.  The C1/D1 PPM

11

does not use the term "SBA IO Strip", nor is there a description of the process of creating an SBA IO Strip.

The PPM contains warnings that the investment has risks, and states specifically that it is an investment for "a sophisticated investor who is able to bear the risks inherent in an investment in the Notes." SEC Ex. 5 at APP00138. Further, the PPM warns that "some" of the "Guaranteed Debt Obligations" purchased to back the Notes will be sold at a "premium" and that "if a Loan should default or be prepaid, [ECA] could realize as a loss the unamortized portion of such premium." *Id*. Later in the same section, the PPM informs that ECA's "investment strategy depends on its ability to negotiate a purchase price of Loans that it believes will generate a return above the premium paid for the Loans" and the PPM explains that the cash flow from the investment could be less than expected if, *inter alia*, the loan prepays or defaults. SEC Ex. 5 at APP00138. A "default risk" is explained by first noting that the "Loans will be guaranteed by the United States Government" but that a loss may occur "with respect to the premium amount the Company paid above the guaranteed par piece of the Loan" and only to the extent that the premium has not already been recouped by "payment of principal and interest on the Loan." *Id*. A similar warning is repeated concerning "prepayment risk" concerning loss of "the premium paid over par for the Loan" because "payments of principal and interest" on the loans will cease. *Id*.

### 3.    The C2/D2 PPM offered by EIGI.

In December, 2008, EIGI issued the C2/D2 PPM. SEC Ex. 14. Through August 2010, the C2/D2 offering raised $5.4 million from 33 investors. Dkt. 5-1 ¶ 12. The executive summary portion of the C2/D2 PPM begins:

> The Company was formed primarily to invest in a portfolio of interests in debt obligations guaranteed by the full faith and credit of the United States

Government, its agencies or instrumentalities, assignments of interest in such obligations, and commitments to purchase such obligations.  These guaranteed debt obligations will consist of the guaranteed portion of floating-rate loans guaranteed by the U. S. Small Business Administration under the SBA 7(a) program, the U. S. Department of Agriculture, and may also consist of other portions of loans that are guaranteed by the United States Government under various government guaranteed loan programs ("Guaranteed Obligations").

Dkt. 14 at APP00193. Following this portion of the PPM is language taken directly from the C1/D1

PPM describing the advantages of the Note offering, but one word is added (in italics):

> 1.      Safety of principal because the Notes are secured by a portfolio of debt obligations guaranteed by the *unconditional*, full faith and credit of the United States Government, its agencies or instrumentalities, assignments of interest in such obligations, and commitments to purchase such obligations.

SEC Ex. 14 at APP00193 (emphasis added).  The C2/D2 PPM contains a description of EIGI's

"business" and describes the nature of the investment:

> In pursuing its objective of earning the highest level of current income consistent with safety, liquidity, and preservation of capital, [EIGI] has been formed to invest 100% of the net proceeds of the Offering . . . in a portfolio of interests in United States ("U.S.") Government guaranteed floating rate bank loans and other debt obligations issued or guaranteed by the full faith and credit of the U.S. Government, its agencies or instrumentalities, assignments of interest in such obligations, and commitments to purchase such obligations, the interest rates of which float or adjust periodically . . . . .  These debt obligations **will consist** of the guaranteed portion of floating-rate loans guaranteed by the United States Small Business Administration ("SBA") under the SBA 7(a) program, and pools and originator fees of such loans as more thoroughly described below, and the U. S. Department of Agriculture ("USDA"), and **may also consist of other portions of loans that are guaranteed by the United States Government under various government guaranteed loan programs** . . . .

SEC Ex. 14 at APP00195 (emphasis added).

The PPM further promises that "substantial leverage will be utilized" and that EIGI "will typically seek to utilize a Credit Facility to finance 90% to 100% of the Par portion of Loans acquired, which represents the U.S. government guaranteed portion of the Loan" but that the

13

remainder of the loans will be purchased by investor funds.  SEC Ex. 14 at APP00195.  The benefit

of this arrangement is then explained, in that the "interest rate on the Credit Facility is expected to

be . . . significantly less than the fixed annual interest rates" on the Notes issued to investors.  SEC

Ex. 14 at APP00195.

The C2/D2 PPM also contains a lengthy explanation of the secondary market for SBA loans,

including a description of how loans are "pooled," and, several paragraphs into the description, the

process of creating an SBA IO Strip, which the PPM identifies alternately as an "Originator Fee."

SEC Ex. 14 at APP00196.  After a lengthy explanation of the process of "stripping" portions of the

interest from a loan to form an "Originator Fee," the reader is informed that the SBA "guarantees

payment on Originator Fees" and that the "full faith and credit of the U.S. Government support such

guarantee" but that in the case of prepayment or default the payment of interest "is limited to a

specified time period," which time period is not, in fact, specified in the PPM.  SEC Ex. 14 at

APP00197.

Several pages following the "Originator Fee" section, "Risk Factors" are listed beginning

with the warning that the notes involve "a high risk of loss and lack of liquidity" making the

investment suitable only for persons who can afford "to bear such risk" including risk of the loss of

"entire investment."  SEC Ex. 14 at APP00203.

Under "other risks," a section titled "U.S. Government Guaranteed Loan Risk" investors are

informed that EIGI's "investment strategy depends on its ability to negotiate a purchase price of

Loans that it believes will generate a return above the premium paid for the Loans" and it is

explained that the cash flow from the investment could be less than expected if, *inter alia*, the

borrower prepays or defaults on the loans.  SEC Ex. 14 at APP00204.  A "default risk" is explained

by first noting that the "Loans are guaranteed by the United States Government" but that a loss may occur "with respect to the premium amount the Company paid above the guaranteed par piece of the Loan" and only to the extent that the premium has not already been recouped by "payment of principal and interest on the Loan." *Id*. The C2/D2 PPM also warns of "prepayment risk" but again this discussion is couched in terms of a risk that "anticipated payments of principal and interest from the Loan may be terminated prior to the full amortization of the premium." *Id*.

**4.     Testimony at the hearing.**

**a. Dr. Kyle Fisher.**

Dr. Fisher testified that he invested in the C2/D2 Notes in Spring 2009 on the recommendation of his partner.  He was looking for a safe investment, and he was struck by the title of the C2/D2 PPM, which mentions only SBA "loans."  He was also impressed by the emphasis on safety of the portfolio principal, and on the fact that the investment is backed by the federal government.  He admitted that the first page of the 27 pages of the PPM was "enough" for him, and that he read only the first 6 to 7 pages in total.

Dr. Fisher had no understanding of SBA IO Strips, or what they were, at the time he decided to invest $750,000, representing 80% of his retirement fund.  He saw the risk disclosures in the C2/D2 PPM, but he believed the only risk in an investment backed by the full faith and credit of the Unite States was that the government would default.  He would not have invested if he knew that the bulk of the investment backing the Notes would be in SBA IO Strips that put the principal of his investment at risk upon default or prepayment.  On cross-examination, the witness further conceded that he read the warning that he should not invest unless he could bear the risk of a full loss.  Dr.

Fisher also testified that he did not understand the PPM to permit his investment funds to be used to pay back earlier investors.

>   **b.**     **James Billings**

James Billings is a financial advisor.  He reviewed the C2/D2 PPM, as did his broker/dealer, who approved the investment after review.  Billings's recommendation to his clients, who ultimately invested $2.1 million with EIGI (of the $5.4 million invested in the C2/D2 offering), was premised upon the "safety of principal" promised in the PPM along with the nature of the investments being in "guaranteed debt obligations."  Mr. Billings viewed the warnings portion of the PPM as mere "boilerplate" which appears in all such memoranda.  Billings would not have recommended the investment to his clients if he knew that investment in SBA IO Strips was intended.  He believes SBA IO Strips are too risky for his clients' purposes.

>   **c.**     **Damian Omar Valdez**

Defendant Valdez was called as a witness and testified that, at the time the PPMs in this case were issued, he had a detailed understanding of the SBA secondary loan market, and about the nature and risks of SBA IO Strips in particular.  Specifically, an SBA IO Strip is the same thing as an "originator fee" for an SBA loan.  An SBA loan, purchased with a premium, would leave only the premium subject to the risk of loss through prepayment or default on th underlying loan.  SBA IO Strips, however, are entirely premium from the investor's standpoint, and prepayment or default makes the Strips "worthless."[2]

---

[2]     In fact, the first strip purchased by ECA in this case for the C1/D1 Note was prepaid or defaulted, and resulted in a loss of $30,000 on a $44,000 original investment.  Sec Ex. 6.

Valdez testified that ECA purchased only SBA IO Strips with the investors' funds pursuant to the C1/D1 Note, and that no actual SBA loans were purchased with those funds. He believes that the possibility of purchasing SBA IO Strips was set forth in the C1/D1 PPM in the portion that identifies both SBA loans and "loan assets," with an SBA IO Strip, in his view, constituting a "loan asset." Valdez conceded, however, that neither the word "Strip" nor the term "originator fee" appear in the C1/D1 PPM.

Valdez also testified that, although he attempted to obtain "leveraging" for the Notes through contacting banks and other financial institutions, he was completely unsuccessful with respect to the C1/D1Notes, and that he had only limited success with respect to the C2/D2 Notes. However, Valdez testified that choosing to invest in SBA IO Strips instead of in SBA loans was an "alternative" to obtaining leverage with respect to both the C1/D1 Notes and the C2/D2 Notes. Valdez did not identify any language in the PPMs that identified SBA IO Strips as a potential "alternative" to a "credit facility," or as a means of obtaining "leverage."

USBank was the broker/dealer for ECA, and SEC Exhibit 12 is a list of questions it had concerning the C1/D1 PPM prior to the time it was released. Valdez said that he read the concerns about defining "a portfolio of loans," and specifically the question whether this means that ECA intended to "only purchase the US Government Guaranteed portion of the loan" and recommended that ECA "clearly define what [it is] purchasing." SEC Ex. 12. Valdez considered the comments "minimal" and made no changes to the C1/D1 PPM with respect to the definition of what was being purchased.

Valdez conceded that ECA and EIGI have suffered roughly a $1.1-$1.2 million on a cost basis loss since inception of investments, and that 22% of the SBA IO Strips have defaulted or

prepaid.  Since all of  ECA's assets were transferred to EIGI, EIGI now owes $5.4 million to investors, but presently has only $3.8 million in assets.  ECA has an additional debt of $600,000 to Anthony Hart, who provided Valdez with seed money for this venture.

Valdez testified that the practice of both ECA and then EIGI of taking all Note proceeds beyond the interest due to investors each month as "management fees and profit" was done at his direction.  Further, he defended his numerous trips overseas funded by ECA and EIGI as attempts to broaden either ECA's or EIGI's business, but was unable to identify any real or potential business arising from those trips.  Valdez further testified that returns on the Notes have been at or near what he anticipated.  Further, he stated that, at some point, EIGI was going to stop taking all of the excess interest income as fees and profit, and would establish a fund from which current investors could be repaid at the end of their three and five-year investment.  He did not identify when that might occur, and he conceded that the first of the C2/D2 notes are due in early 2012.

### d.    Claire Barrows

Claire Barrows is staff accountant for the SEC, and has provided spreadsheets detailing the losses suffered by ECA and EIGI on the current investments.  Dkt. 5-10.  She testified consistent with the spreadsheets, and the information about the losses suffered by ECA and EIGI were conceded by Valdez as set forth above.

### e.    Douglas Gordimer

Douglas Gordimer is Senior Investigative Counsel for the SEC's Enforcement Division.  He testified consistent with his Declaration filed in this matter that the C1/D1 PPM listed "safety of principal" as the first investment objective, but that the investment made, SBA IO Strips, was in a "stream of interest payments with no principal."  Dkt. 5-1 ¶¶ 15-17.

The C1/D1 offering also promised "substantial leverage" from credit facilities to obtain the promised returns, but ECA employee Cade told Gordimer that prior to the offering, Valdez failed to obtain such financing and never did obtain anything like a credit facility. *Id*. ¶ 20. Further, with respect to the C2/D2 offering, Valdez, acting for EIGI, did not disclose his earlier failure to obtain leverage through a credit facility. *Id*. ¶ 21.

Gordimer also identified what he considers specific misleading aspects of the C2/D2 PPM where investors are told that their money "may" be used to purchase "Series 1 Notes." *Id*. ¶ 22. Further, less than half of the C2/D2 funds was used to purchase SBA loans, which took the form of a $1.9 million investment in a Troubled Asset Relief Program ("TARP") funded trust. Fully half of the funds, $2.7 million, was used to pay back the C1/D1 investors in "Ponzi" payments. Another $640,000 was spent on new SBA IO Strips. *Id*. ¶ 23.

Gordimer believes that the C2/D2 PPM also fails to disclose that SBA IO Strips will, in fact, be purchased, although it does include a description of SBA IO investments. Risks of default and prepayment are disclosed, but no information is given concerning the likelihood of the risk (15% default rate) or that the "specified time period" of the guarantee is "a few months" with respect to a 25 or 30 year loan. *Id*. ¶ 25. Further, "leverage" is promised from a "credit facility," but prior failures to obtain leverage are not disclosed, and the TARP investment, that was in the nature of "leverage," was too "small and short-lived" and was not what was promised in the PPM. *Id*. ¶¶ 26-29.

Mr. Gordimer also confirmed the "precarious financial condition" of EIGI, along with the cumulative effects of the practice of taking excessive management fees, which totaled $2.4 million while the interest payments to Note holders totaled only $1.7 million. *Id*. ¶ 34. Gordimer believes

that losses are likely to continue, and, with the expected rate of continued defaults, taking of excessive fees, and the lack of other investments, EIGI's financial condition is "likely to deteriorate." *Id.* ¶ 35.

### f.    Bradley Whitener

Also part of the record is the deposition testimony of Bradley Whitener, a partner at the investment firm of Cantor Fitzgerald, the firm that sold the SBA IO Strips purchased by ECA and EIGI.   SEC Ex. 28.   He testified that he would be "very careful" about calling an IO Strip "guaranteed by the full faith and credit of the United States Government" because doing so without explaining the difference between an IO Strip and an SBA loan "could be misleading." *Id.* at 38. More specifically, an SBA loan "you get paid back the par amount of the guarantee," where an IO Strip has "no par amount," so that you can't get back "any set amount" in the event of prepayment or default. *Id.* at 39.   If a typical IO Strip on a 25-year loan prepaid after one year, an investor is likely to lose half of the investment. *Id.* at 34.   Finally, IO Strips are not easily liquidated by purchasers like ECA or EIGI. *Id.* at 40.   The value of the strips decline with time, and the sale price of the strips if resold will be less than what was paid originally. *Id.* at 42.

### ANALYSIS

The SEC argues that securities fraud has been established in this case because defendants, in the PPMs for the two Notes, misrepresented "the very nature of the Defendant's Government Guaranteed Loan Program and the underlying investments (i.e., the risky SBA IO Strips); risks related to promised leverage that never materialized; and uses of investor funds, including Ponzi payments to earlier investors." Dkt. 4 at 9-10.   And, with reference to *scienter*, the SEC argues that Valdez "knew or was severely reckless in not knowing that the PPMs failed to disclose the nature

and risk-profile of the SBA IO strips," and that "leverage was crucial to obtain the returns needed to repay the Notes," but that Valdez already "knew that he had been unable to secure the necessary financing" when the offerings were made.

Defendants respond that there were no misrepresentations concerning the nature of the investments that would be made. More specifically, they argue that the SBA IO Strips *are* guaranteed by the SBA—although that guarantee is limited to payment of interest for a specified period of time after default or prepayment. Dkt. 16 at 13. Thus, comments in the PPMs concerning the "guaranteed" nature of the investments are not misleading. Defendants also argue that "full faith and credit" of the SBA did back the Notes because the SBA "guarantees the holder of the originator fee against [a] failure to properly forward the appropriate amount." Dkt. 16 at 14. With respect to the issue of "leverage," defendants argue both that the PPMs made clear that the leverage had not yet been obtained, and, through defendant Valdez's testimony, defendants have asserted that SBA IO Strips were a "substitute" for leverage.

## 1.    "Guaranteed" nature of the investment.

The heart of this case is the difference between the risks of investing in an SBA loan and investing in an SBA IO Strip. The court does not understand defendants to challenge the proposition that promising an investment in SBA loans, but then investing in SBA IO Strips, would be misleading and would omit facts that a reasonable investor would consider significant in making the decision to invest, "such that it alters the total mix of information available about the proposed investment." *Krim*, 989 F.2d at 1445. Indeed, even if the matter was in dispute, the court finds that the SEC has met its burden of proof by a preponderance of the evidence that the two investments are so different in nature and risk that promising one and delivering the other would "alter the total

mix" of information and would be misleading for purposes of the antifraud provisions of the Exchange Act.

The court views the dispute in this case as whether defendants, through the PPMs, disclosed both their intent to purchase SBA IO Strips, and also the risks inherent in such an investment. In the court's view, the deposition testimony of SEC witness Whitener places this issue in the proper context.  He states that, if he were preparing a PPM, he would say that SBA IO Strips "are guaranteed," but he would then explain "but this is the risk."  SEC Ex. 28 at p. 83.  The court agrees with defendants that merely representing a portfolio of investments which includes SBA IO Strips as possessing a government "guarantee" is not necessarily fraudulent because there is a limited guarantee.  However, the greatly disparate guarantees, and the greatly disparate risks associated with SBA IO Strips as opposed to SBA loans make it misleading to refer to the guarantee applicable to an SBA loan and that applicable to and SBA IO Strip without a detailed and accurate explanation of the substantial differences between the two.  Thus, the questions are:  (1) did the PPMs disclose to investors an intent to invest in SBA IO Strips; and (2) did the PPMs disclose all material facts concerning the nature of SBA IO Strips and the risks posed to investors.

### a. The C1/D1 PPM

The C1/D1 PPM does not in any fashion explain the nature of an SBA IO Strip nor does it indicate that any such investment will be made with investor funds.  The PPM repeatedly notes that the "debt obligations" invested in are loans "guaranteed" by the United States.  Further, the "BUSINESS" section of the executive summary specifically and unequivocally states that investments *will* be made in "guaranteed portion(s) of floating-rate loans."  SEC Ex. 5 at 00135. This is a clear reference to SBA loans, and not to SBA IO Strips.  No investment was made in SBA

loans with the C1/D1 investor funds, and this alone constitutes a material fact not disclosed to investors.

Nonetheless, defendants note that the C1/D1 PPM informs potential investors that the Notes "may also consist of other portions of loans that are guaranteed by the United States Government under various government guaranteed loan programs." This, defendants argue, informs the reader that investment in SBA IO Strips is an option. This argument must be rejected for two reasons. First, the indication is that the Notes "*may also* consist of" "portions of loans." Therefore, the option of investing *solely* in "other portions of loans" is simply not disclosed, and is a material fact that would change the "total mix" for an investor. Second, and in any event, the phrase "portion of a loan" does not suggest to a reader, even one who is familiar with SBA IO Strips, that SBA IO Strips will be purchased. As discussed above, SBA IO Strips carry much greater risks for an investor than SBA loans, and are they not "guaranteed" in the same sense that SBA loans are guaranteed. Thus, the mere reference to a "portion of a loan" does not communicate to a potential investor that SBA IO Strips will be purchased, much less the disparate risks inherent in purchasing Strips rather than loans. Therefore, the court must reject defendants' assertion that investors were put on notice that ECA would invest any portion of C1/D1 investor funds in SBA IO Strips, and ECA certainly did not inform investors that this was to be the *sole* investment made with their funds.

Defendants also argue that risk warnings in the C1/D1 PPM explaining prepayment and default risks with respect to the "premium portion" of an investment also alerted potential investors to the potential of an SBA IO Strip investment. The warnings, however, refer to a possible interruption of "payments of principal **and** interest" in the event of prepayment or default and risk to the "premium above par" paid on the "Loan." SEC Ex. 5 at APP00138. These warnings make

sense when applied to SBA loans, which when purchased on the secondary market have both a principal and premium component.  These warnings make no sense when applied to an SBA IO Strip, and are inconsistent with such an investment option, because the warnings presuppose payment of principal and interest, presuppose a "par" or "principal" component, and refer to a "loan" and not to a "loan asset."  In short, the risk factors set forth in the C1/D1 PPM make the SEC's case stronger.

Investors were not informed that SBA IO Strips were a possible investment vehicle for C1/D1 investor funds, nor were the risks inherent in such investments disclosed.  These are material facts that alter the "total mix" of information.

### b.    C2/D2 PPM

The C2/D2 PPM has much more detail than the C1/D1 PPM.  Investors are informed that the debt obligations securing the Notes will consist of "the guaranteed portion" of SBA loans and "and originator fees of such loans. . . ."  SEC Exhibit 14 at 00195.  The "originator fees" are later described as being "extra percentage points" that the assembler of a pool can "strip off" and sell as an "income stream to third parties."  *Id*. at 196.  Later, the term "originator fee" is equated with the term "interest-only strip."  *Id*.  With respect to the risks associated with such investments, the PPM states that the "SBA guarantees payment on Originator Fees" and that "the full faith and credit of the U. S. Government supports such guarantee."  *Id*. at 00-197.  This language does at least present the possibility of investment in SBA IO Strips, but there is no meaningful explanation of the risks involved or the limited nature of the guarantee.

Once again, the "risk factors" portion of the C2/D2 PPM makes the SEC's case stronger. The risks of prepayment and default are, consistent with the C1/D1 PPM's treatment of the issues,

described in terms that are not only inconsistent with, but which actually exclude, SBA IO Strips. SEC Ex. 14 at APP00204.  Investors are told that prepayment or default would stop "payments of principal **and** interest."  *Id.*  As discussed above, this is inherently inconsistent with and rules out such an investment because only interest is paid on an SB IO Strip, and all of the investment constitutes premium over par.

Investors are also told in a section labeled "Loss of Premium" that "some" of the debt obligations purchased will be at a premium "not backed by a Government guarantee" and that the unamortized portion of any such premium is at risk of loss in the case of default or prepayment. First, if this is meant to refer to SBA IO Strips, it is inconsistent with defendants' position that Strips *are* guaranteed by the government.  Second, this warning does not explicitly apply to "Originator Fees," the term used in the C2/D2 PPM to refer to SBA IO Strips, and there is no other information in the PPM that would permit a reader to believe that the entire investment in an "Originator Fee" would lack a government guarantee.  In short, this is another "risk factor" that does not provide an investor with useful information in ascertaining the nature or risks of an investment in SBA IO Strips.

The SEC also presented evidence that an investor, and an investment advisor (and the investment advisor's broker/dealer) reviewed the C2/D2 PPM and failed to ascertain that SBA IO Strips would be part of the investment.  This, along with the wording of the PPM itself, leads the court to find that the SEC has met its burden of establishing by a preponderance of the evidence that the C2/D2 PPM did not disclose material information such that the total mix of information available to investors did not adequately inform them that SBA IO Strips were going to be

purchased, or that the investment would be subject to risk of total loss with respect to such investments.

## 2.    Leveraging with credit or "credit facility."

Investors were informed in the C1/D1 PPM that leverage would be utilized in the form of a "credit facility" or loan proceeds, and that this would account for 80% to 90%" of the investment, thereby permitting ECA "to pay debt service on the Notes and earn management fees and a profit on its Loan purchase and trading business."  *Id*. at APP00136.  The C2/D2 PPM states that "substantial leverage will be utilized" and that EIGI "will typically seek to utilize a Credit Facility to finance 90% to 100% of the Par portion of Loans acquired, which represents the U.S. government guaranteed portion of the Loan" but that the remainder of the loans will be purchased by investor funds.  SEC Ex. 14 at APP00195.[3]  The SEC has provided compelling evidence that defendant Valdez knew before either PPM issued that he was not likely to obtain a credit facility.  Indeed, he certainly knew at the time the C2/D2 PPM was issued that he had been unsuccessful in obtaining leverage on the C1/D1 Notes.

Defendants respond that the PPMs state that leverage was "anticipated—not promised" in the PPMs.  Dkt. 16 at 20.  This is simply not a reasonable reading of the PPMs, which clearly envision investments by Note holders that are "leveraged" by 4 to 5 times as much investment though a "credit facility."  Further, it does not explain the failure in the C2/D2 PPM to note the inability to obtain leverage on the first investment.

---

[3]      And, of course, the leverage portion of each PPM is inconsistent with the purchase of SBA IO Strips because each refers to the par portion of loans being purchased—a concept inconsistent with the nature of an SBA IO Strip.

Defendant Valdez testified that use of SBA IO Strips as part of the investment is a "substitute" for a credit facility and provided "leverage."  In the court's view, this testimony is simply not credible.  The concepts of investing in SBA IO Strips and obtaining a loan in order to purchase SBA-guaranteed loans are inconsistent.  And, in any event, the concept of replacing a promised leveraging with the purchase of SBA IO Strips is nowhere disclosed in either PPM.

The court finds that the promise of "leveraging" was made in both PPMs when defendant knew that the promised leverage would not be forthcoming, and certainly that it would not provide "80% to 90%" of the investment as promised.  This is information that altered the total mix of information for a reasonable investor.

## 3.    Scienter

Defendant Valdez was intimately aware of the risks of investing in SBA IO Strips.  His decision to leave this information, or even the intention to purchase Strips, out of the C1/D1 PPM certainly was the result of severe recklessness at least.  Likewise, the C2/D2 PPM is again the result of at least severely reckless behavior for again withholding necessary information about the nature of the investment, and the unavailability of leveraging consistent with what was promised therein.  Therefore, the court finds that Valdez, and through him, ECA and EIGI, possess the requisite scienter to make the misrepresentations by omission set forth above violations of the antifraud provisions of the Exchange Act.  A violation of the Securities Act is already established because no scienter is required.

## 4.    Permanent Injunctive Relief.

Again, the relevant considerations in imposing injunctive relief are: (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4)

sincerity of defendant's recognition of his transgression, and (5) likelihood of opportunities for future violations. *Gann*, 565 F.3d 940 (5th Cir. 2009). In applying this test, the court finds the defendants' arguments concerning the financial condition EIGI is in helpful in determining whether to grant relief.

Defendants view the current status of their Note offerings differently than does the SEC. The C1/D1 investors have been paid back in full, making that offering a "success" in defendants' view. As for the fact that investment principal from the second offering was used to fund the pay-off of the first offering (which the SEC terms "Ponzi" payments), defendants view this as an indication that the investment strategy has not yet been brought to full fruition.

Of course, it is the very nature of a Ponzi scheme that early investors are often provided with the promised return on their investments—it is only when the costs and losses outstrip the defendants' ability to obtain new funds from investors that a Ponzi scheme results in actual losses to investors. Thus, the mere fact that the C1/D1 investors have been paid back is not necessarily a point in defendants' favor, nor does this repayment disprove the SEC's allegations. Indeed, as the SEC suggests, it is the *source* of the payments to the C1/D1 investors that identifies the dangerousness of the "investment strategy" at play in this case. Defendants were able to make those promised payments only because they obtained funds from new investors. The SEC has presented compelling evidence that EIGI's current financial situation will permit the current investment strategy to succeed only if new investors are found whose money can be used to fund payments to the prior investors. This is the quintessential Ponzi scheme. And it is of no moment that the investment strategy has not yet collapsed of its own accord.

28

The court also concludes that defendants' practice of taking all monies from the account each month as profit, and of creating no fund with which to pay back investors when the Notes come due, would have continued unabated had the SEC not sought injunctive relief and obtained a temporary order freezing defendants' assets.  Defendant Valdez has not only not recognized his transgressions in this case, he continues to assert that there is simply nothing amiss.

## Conclusion

Wherefore, on the basis of the foregoing, it is hereby ORDERED that the Securities and Exchange Commission's motions for preliminary and permanent injunction, asset freeze, and appointment of a receiver are GRANTED.  Dkts. 4, 6.

It is further ORDERED that the Agreed Order Freezing Assets (Dkt. 12) is made PERMANENT.

It is further ORDERED that the SEC shall submit the name of a proposed receiver and a form of order appointing the receiver on or before January 12, 2012.

It is further ORDERED that defendants are hereby permanently enjoined from further violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act").

Signed at Houston, Texas on December 22, 2011.

_____
Gray H. Miller
United States District Court

29