IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § *Plaintiff*, § § v. § § EVOLUTION CAPITAL ADVISORS, LLC, *et al.*, § § *Defendants*. § | CIVIL ACTION H-11-2945 |

**MEMORANDUM OPINION & ORDER**

Pending before the court is the Securities & Exchange Commission's ("SEC") motion for disgorgement, prejudgment interest, and third-tier civil penalties against defendants Evolution Capital Advisors, LLC, Evolution Investment Group, I LLC and Damian Omar Valdez (respectively, "ECA," "EIGI," and "Valdez"; and collectively, "defendants").[1] Dkt. 70. In short, the SEC seeks equitable and punitive remedies against defendants for their violations of federal securities laws in the operation of the Evolution Ponzi scheme. The court has considered the SEC's motion, responsive briefing, relevant evidence of record, and applicable law. For the reasons that follow, the SEC's motion (Dkt. 70) will be **GRANTED IN PART & DENIED IN PART**.

**I. BACKGROUND**

The SEC commenced this enforcement action against defendants on August 10, 2011. Dkt. 1. The SEC alleged securities fraud with respect to two "Secured Note" offerings (the "Notes") by the defendants from February 2008 to August 2010. Dkt. 42 at 1. The SEC claimed that Evolution made misleading and incomplete representations to potential investors in the Notes, thereby

---

[1] Where appropriate in this order, ECA and EIGI will together be referred to as "Evolution."

violating the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). *Id.* at 1, 4. Through the sale of the Notes, Evolution received approximately $10.1 million in investments from 82 investors (the "Noteholders"). *Id.* at 5. The SEC also alleged that Evolution used $2.7 million from the proceeds of the second offering to make premium payments to the first offering's investors, in what the SEC characterized as a Ponzi scheme. *Id.* According to the SEC, the alleged misrepresentations in the Notes, along with the defendants' practice of taking "exorbitant" fees in the amount of $2.4 million, created a "dire" financial situation for Evolution and, in turn, its Noteholders. *Id.* As of December 31, 2010, Evolution's assets were at least $1.4 million less than the amount owed to the Noteholders. *Id.* at 5–6.

The SEC sought equitable relief in the form of preliminary and permanent injunctions against future violations of the securities laws by Evolution, an asset freeze, and the appointment of a receiver to take control of, marshal, and preserve Evolution's assets for the benefit of defrauded investors. Dkts. 3–6. On December 22, 2011, after an October hearing on the request for injunctive relief, the court granted the request and appointed a receiver. Dkt. 42. The court held that Evolution perpetrated a fraudulent Ponzi scheme through the offer and sale of the Notes to the Noteholders. *Id.* at 28 ("The SEC has presented compelling evidence that [Evolution's] current financial situation will permit the current investment strategy to succeed only if new investors are found whose money can be used to fund payments to the prior investors. This is the quintessential Ponzi scheme."). The court further found that the Private Placement Memoranda used in each offering were misleading and failed to disclose material facts regarding (1) the distinction between two types of investments that would be made in U.S. Small Business Administration ("SBA") backed loans, portions of which

are guaranteed by the U.S. government, and (2) the amount of "leverage" to be obtained from a "credit facility" to fund the balance of the investment portfolio. *Id.* at 21–27.

On January 6, 2012, the court appointed Thomas L. Taylor, III as the receiver for the defendants. Dkt. 44 at 1. The court directed the receiver to take complete and exclusive possession, custody, and control of all receivership assets and records. *Id.* at 2. As the representative of the defrauded Noteholders, the receiver possessed the power to make "requests to any authority, foreign or domestic, for the return of funds that [the Noteholders] contributed to the Defendants, wherever such funds may have been transferred, and for the purpose of filing actions to recover such funds wherever the Receiver may deem necessary." *Id.* at 6.

On October 24, 2012, the receiver moved for approval of a plan of distribution of funds to the Noteholders. Dkt. 66. Specifically, the receiver proposed an interim distribution of $3,620,000 to EIGI investors and the three ECA investors who were not repaid their principal amounts. *Id.* at 3. This distribution approximated a 75% return of these investors' principal. *Id.* The receiver noted that any "[a]dditional recoveries and distributions would be applied first to repayment of addition principal to these investors until 100% of their principal is returned bringing them to parity with the ECA investors as to principal." *Id.* at 3–4. The receiver cautioned that a full principal recovery was not assured, but "should 100% re-payment of principal be achieved—bringing EIGI investors to parity with all ECA investors as to principal—any additional distributions would be applied *pro rata* (based on invested principal) to the total of interest payments which should have been earned by both ECA and EIGI investors." *Id.* at 4.

On November 26, 2012, the court granted the receiver's motion. Dkt. 68. The receiver thereafter distributed $3,620,000 to the investors. *See* Dkt. 69. He also informed the court that "[a] final distribution will be made upon conclusion of the Receivership." *Id.* at 1.

The SEC now moves for final judgment against the defendants, seeking disgorgement, prejudgment interest, and a civil penalties. Dkt. 70. Valdez's response does not contest liability for disgorgement; rather, Valdez challenges the SEC's disgorgement calculation as premature for failing to offset business expenses and before a final distribution to investors has been made.[2] Dkt. 72 at 3–6. Further, because prejudgment interest and civil penalties may be based, at least in part, on the defendants' total disgorgement, the defendants request that these calculations be deferred until the final disgorgement liability is established. *Id.* at 7. In the SEC's reply, it does not oppose an offset of the amounts ultimately distributed by the receiver, but the SEC argues that this offset should be provided post-judgment, after the conclusion of the receivership. Dkt. 75 at 2.

## II. ANALYSIS

### A. Disgorgement

The court has broad discretion to award disgorgement and, if so, the amount of any award. *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993). The purpose of this remedy is to deprive the party or parties responsible for the fraud of their gains and to deter future violations of the law. *Id.* at 76 n.8. Regarding the calculation of a disgorgement figure, the Fifth Circuit has stated that "[t]he court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978). This "profit," however, is not derived from a wrongdoer's ultimate enrichment after business and other

---

[2] Defendants ECA and EIGI did not respond to the SEC's motion.

expenses are deducted. *SEC v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998) (noting the "overwhelming weight of authority" holding that securities law violators may not offset their liability with business expenses). Rather, the defendant is subject to disgorging a reasonable approximation of the proceeds causally connected to the wrongdoing. *Seghers*, 298 F. App'x at 336 ("A defendant is not immune from disgorgement merely because he has spent or lost the proceeds of his fraudulent scheme."); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (holding that disgorgement establishes a defendant's personal liability to pay an amount equal to wrongfully-obtained sums, regardless of the disposition of the original assets). Defendants will, however, receive a set-off "for amounts repaid to investors or collected by the special master." *SEC v. United Energy Partners, Inc.*, 88 F. App'x 744, 747 (5th Cir. 2004).

Here, the SEC has presented the declaration of Andrew Goforth, an attorney for the receiver. Mr. Goforth reviewed the books and records of the Evolution estate and determined that the defendants raised proceeds of $10,178,000 in investor principal through the two offerings. Dkt. 71-1 (declaration of Andrew M. Goforth) at APP001 ¶ 3. Goforth also testifies that Evolution made payments to investors in the total sum of $6,374,658.69. *Id.* at APP002 ¶ 4. Subtracting the latter number (investor payments) from the former (proceeds), the SEC has presented evidence that the profits of the defendants' illegal scheme equal $3,803,341.31. *Id.* at APP002 ¶ 5.

The defendants are also entitled to an offset for amounts collected by the receiver and returned to the investors. *United Energy Partners*, 88 F. App'x at 747. To date, the receiver has repaid $3,620,000 to the Noteholders. Dkt. 69 at 2. This repayment further reduces the defendants' disgorgement liability to $183,341.31. But the receiver's work is not yet complete. The receiver has

notified the court that he plans to make a final distribution to the Noteholders, which would further reduce the defendants' disgorgement liability. Dkt. 69 at 1. Until the receiver does so, the court cannot calculate a final disgorgement figure. The receiver is therefore **ORDERED** to file a renewed motion for final judgment against the defendants after he makes the final distribution to the investors. At that time the disgorgement award of $183,341.31 will be reduced appropriately to reflect any further amounts returned to the investors.

B.     *Prejudgment Interest & Joint & Several Liability*

The SEC requests prejudgment interest on any award of disgorgement. Dkt. 70 at 6–7. "An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness." *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir. 1975), *rev'd on other grounds*, 430 U.S. 1 (1977). Prejudgment interest is compensatory, not punitive, and is meant to prevent defendants from "benefitting from what is, in essence, an interest-free loan resulting from illegal activity." *U.S. SEC v. Reynolds*, No. 3:08-cv-0438-B, 2013 WL 3778830, at *7 (N.D. Tex. July 19, 2013). Although the Fifth Circuit has not established a set of factors for the court's evaluation of prejudgment interest, the Second Circuit considers: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (internal quotation marks omitted). In calculating this sum, the court generally turns to the Internal Revenue Service's underpayment rate related to income tax arrearages. 26 U.S.C. § 6621(a)(2); *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007).

Lastly, courts likely will order joint and several liability against defendants as to the disgorgement figure plus interest when "two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *see also First Jersey*, 101 F.3d at 1475.

In its December 2011 order, this court found that Valdez controlled the Evolution entities and was responsible for the actions of those companies. Dkt. 42 at 9–10; *id.* at 10 n.1. The court further concluded that the defendants, including Valdez and the Evolution entities, perpetrated a fraud against the investors of both offerings through a "quintessential Ponzi scheme." *Id.* at 27–29. The court therefore concludes that the misconduct of Valdez and the Evolution entities is inseparable, and joint and several liability against the defendants is warranted.

Regarding prejudgment interest, the court finds that an interest award is premature at this time. The receiver may, in his renewed motion for final judgment, argue for a prejudgment interest award that reflects the defendants' liability for disgorgement and is consistent with the factors outlined in the Second Circuit's *First Jersey* opinion.

## C. Civil Penalty

The SEC also seeks an award of civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), in an amount to be determined by the court. Dkt. 70 at 8. Valdez objects to a civil penalty as premature and alternatively objects to the calculation of any award above $150,000, which he contends is the limit for an award against a natural person in these circumstances. Dkt. 72 at 7.

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 1959843, at

*2 (N.D. Tex. May 5, 2008). "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *Koenig*, 532 F. Supp. 2d at 995. The statutory penalty provisions establish an escalating, three-tier structure for securities violations depending on the egregiousness of the defendant's conduct. The court may impose a first-tier penalty after plaintiff demonstrates a violation of the Securities or Exchange Acts. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i). Second-tier penalties may be awarded upon an additional showing that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). And finally, a third-tier penalty may be imposed upon a second additional finding that the defendant's violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C)(II); 15 U.S.C. § 78u(d)(3)(B)(iii)(bb). Under both Acts, third-tier penalties may not exceed the greater of $100,000 for a natural person or $500,000 for any other person (not including the appropriate inflation adjustment mandated by 17 C.F.R. Part 201(E)), *or* the gross amount of pecuniary gain to such defendant as a result of the violation. 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). In this case, because the defendants' gross pecuniary gain ($3,803,341.31) far exceeds the minimum upper limits specified by the Acts, the maximum civil penalty against each defendant is $3,803,341.31.

      Based on the court's findings in its December 2011 order, the court agrees with the SEC that a third-tier penalty is appropriate in this case. This court found that Valdez's decision to leave out certain information regarding the risks of investing in SBA interest only strips "was the result of severe recklessness at least." Dkt. 42 at 27. This *scienter* finding establishes that Valdez's violation "involved . . . reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(C)(I); 15

U.S.C. § 78u(d)(3)(B)(iii)(aa). The court also concluded in 2011 that the defendants' Ponzi scheme was undeniable after the SEC "presented compelling evidence that [Evolution's] current financial situation will permit the current investment strategy to succeed only if new investors are found . . . to fund payments to the prior investors." *Id.* at 28. This untenable strategy, which admittedly did not collapse before the SEC's intervention, nonetheless created a significant risk of substantial losses to investors. These facts support the imposition of a third-tier civil penalty.

Valdez made several misrepresentations by omission in the Private Placement Memoranda at issue in this case. Further, these misrepresentations were made in reckless disregard of his obligations under the securities laws as he knew, and failed to disclose, the risks of investing in SBA interest only strips. The egregiousness of this conduct warrants the maximum penalty against Valdez: $3,803,341.31. Moreover, the court finds that because Valdez controlled the Evolution entities, additional penalties against EIGI and ECA are not warranted to serve the twin goals of punishment and deterrence. The court declines to impose civil penalties against ECA and EIGI.

### III. CONCLUSION

After considering the motion, responsive briefing, record evidence, and applicable law, the SEC's motion (Dkt. 70) is **GRANTED IN PART & DENIED IN PART**. The defendants are jointly and severally liable for disgorgement in the sum of $183,341.31, with prejudgment interest and any further offsets to be determined at a later time. The receiver is **ORDERED** to file a renewed motion for final judgment after he makes a final distribution to the Noteholders, and the court will then decide defendants' total liability for disgorgement and prejudgment interest. Finally, when the court enters final judgment, Valdez will be **ORDERED** to pay a third-tier civil penalty of $3,803,341.31. The SEC's motion for civil penalties against ECA and EIGI is **DENIED**.

It is so **ORDERED**.

Signed at Houston, Texas on October 16, 2013.

_____
Gray H. Miller
United States District Judge